**Below is a Memorandum Decision of the Court.**

*[signature]*

**Mary Jo Heston**
**U.S. Bankruptcy Judge**

**(Dated as of Entered on Docket date above)**

# UNITED STATES BANKRUPTCY COURT

## WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | |
|---|---|
| In re: | Case No. 21-40567-MJH |
| LEAH OLSON, | |
| Debtor. | |
| KATHRYN ELLIS, | |
| Plaintiff | |
| v. | Adversary No. 23-04009-MJH |
| JEFFREY OLSON, | |
| Defendant | |

**MEMORANDUM DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter came before the Court on October 19, 2023, on Defendant Jeffrey Olson's ("Mr. Olson") July 13, 2023, motion for summary judgment (Motion) filed in the above-referenced proceeding pursuant to Federal Rule of Bankruptcy Procedure 7056 (the "Motion"). Plaintiff Kathryn Ellis, the Chapter 7 trustee ("Trustee"), opposes the Motion. Following the close of discovery and the completion of the record on November 16, 2023, as more fully set forth below, the Court took the Motion under advisement. The Court,

MEMORANDUM DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT – 1

having considered the arguments of counsel and the record for the Motion as set forth below, states its opinion is as follows:

## I.  PROCEDURAL HISTORY

On April 19, 2023, the Trustee filed this adversary proceeding. Pl.'s. Compl., ECF No. 1. The complaint alleges a fraudulent transfer under § 548(a)(1), RCW 19.40 applicable through § 544(b), or both related to two quit claim deeds executed by Leah Olson (Mrs. Olson) in favor of Mr. Olson in 2018 and 2019. Pl.'s. Compl., ¶¶ 8-26. On May 19, 2023, Mr. Olson filed his answer to the complaint. Def.'s Answer, ECF No. 4.

On July 13, 2023, Mr. Olson filed the Motion together with the supporting declarations of Mr. Olson and Debtor, Mrs. Olson. Def.'s Mot. Summ. J., ECF No. 11. On August 03, 2023, the Trustee filed her response to the Motion and supporting declaration containing the relevant deeds and tax affidavits. Pl.'s Resp. to Mot., ECF Nos. 15 & 16. In her response, the Trustee adopted an additional theory of liability against Mr. Olson based on an equitable lien in favor of Mrs. Olson and requested more time to complete discovery. Pl.'s Resp. to Mot. at 6:19-7:13. On August 7, 2023, Mr. Olson filed a reply supporting the Motion. Def.'s Reply, ECF No. 17.

On August 10, 2023, the Court heard oral argument on the Motion. Following argument, the Court continued hearing the Motion for the parties to complete discovery. A status hearing on discovery was scheduled for September 28, 2023.

On September 21, 2023, the Trustee filed a supplemental response after deposing Mr. Olson. Pl.'s Suppl. Resp., ECF No. 21. The Trustee's supplemental response was not supported by declaration or properly authenticated transcripts. The parties renewed their oral argument on the Motion at the status hearing held on September 28, 2023. Thereafter, the Court ordered the Trustee to file a declaration with the authenticated excerpts of the transcript of Mr. Olson's deposition by October 6, 2023, and set October

MEMORANDUM DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT – 2

13, 2023, as the response date. The Court continued the Motion hearing to October 19, 2023, to allow for additional oral argument.

The Trustee did not file the declaration or authenticated transcript by the deadline ordered by the Court but instead filed a second supplemental response to the Motion with excerpts of the deposition transcript and business records on October 12, 2023, six days after the deadline. Pl.'s Second Suppl. Resp., ECF No. 25. Mr. Olson filed a reply to the second supplemental response on October 13, 2023. Def.'s Suppl. Reply, ECF No. 26.

On October 19, 2023, the Court held a second hearing and ordered the Trustee and Mr. Olson's counsel to authenticate their extrinsic evidence submitted to the Court for consideration with the Motion. On October 20, 2023, the Trustee submitted an authenticated version of Mr. Olson's deposition transcript. *See* Pl.'s Auth. Trans., ECF No. 29. Mr. Olson's counsel submitted a declaration of authentication requesting that the Court take judicial notice of certain documentary evidence pursuant to Fed. R. Evid. 201. *See* Def.'s Dec. of Doc. Evid., ECF No. 30. All evidence is authenticated, the discovery deadline has passed, and the Motion is now properly before the Court.

The previously scheduled November 2, 2023, pre-trial conference was continued to November 16, 2023, because the Trustee did not appear, apparently due to illness. At the continued pre-trial conference on November 16, 2023, both parties consented to the Court's deemed amendment of the Complaint to include an equitable lien as well as the Court's disposition regarding such equitable lien claim in connection with the Motion. *See* Fed. R. Civ. P. 8(e) ("[p]leadings must be construed so as to do justice."); Fed. Bankr. R. 7015(b). *See also Apache Survival Coalition v. United States*, 21 F.3d 895, 910 (9th Cir. 1994) (when the parties raise issues at summary judgment that are outside the scope of the complaint, courts construe this as a request to amend the pleadings out of time pursuant to FRCP 15(b)).

## II. FACTUAL BACKGROUND

The facts set forth in this section are undisputed by the parties.

### A. THE PURCHASE OF THE BERRY STREET AND KING STREET HOUSES

In May 2015, Mr. Olson purchased the house located at 213 S. Berry St. Centralia, Washington (Lewis County Parcel no. 000961-000-000) (the "Berry Street House") as an unmarried man. Dec. of Jeffrey Olson, ¶ 2; Ex. A, ECF No. 11-1. Mr. Olson married Mrs. Olson on or about June 29, 2018. Dec. of Jeffrey Olson, ¶ 3. On September 12, 2018, the Berry Street House was sold. Dec. of Jeffrey Olson, ¶ 4; Dec. of Leah Olson, ¶ 3, ECF No 11-2. The Lewis County Title Company settlement statement lists Mr. Olson and Mrs. Olson as sellers of the Berry Street House. Dec. of Jeffrey Olson, Ex. B. Mr. Olson, and Mrs. Olson also jointly executed a warranty deed to the buyers of the Berry Street House. Dec. of Kathryn Ellis, Ex. 1, ECF No. 16-2. Lewis County Title Company issued two checks, payable jointly to Mr. Olson and Mrs. Olson, from the proceeds of the sale of the Berry Street House, one for $49,894.13 and one for $2,893.07. Dec. of Jeffrey Olson ¶ 4; Ex. D.

On September 12, 2018, the same day as the sale of the Berry Street House, $49,894.13 in proceeds from the sale of the Berry Street House were wired to escrow for the purchase of another house located at 118 North King Street, Centralia, Washington (the "King Street House"). Dec. of Jeffrey Olson ¶ 4; Ex. B, C, D. The warranty deed real estate excise tax affidavit from purchasing the King Street House names "Jeffrey R. Olson, a married man" as the buyer and grantee. Dec. of Jeffrey Olson, Ex. E, F. On September 10, 2018, Mr. Olson financed the remaining balance of the purchase price of the King Street House by granting a deed of trust to "PRIME LENDING A, PLAINSCAPITAL COMPANY," as "JEFFREY R. OLSON, A MARRIED MAN." Dec. of Jeffrey Olson ¶ 7; Ex. G. The deed of trust and MERS Rider contain Mrs. Olson's signature but do not list her as a borrower. Dec. of Jeffrey Olson ¶ 7; Ex. G. On the same day, Mrs. Olson executed a quit claim deed "to release community interest" to "Jeffrey R. Olson" as grantee. Dec. of Jeffrey Olson ¶ 8;

Ex. H; Dec. of Leah Olson ¶ 5 (the "2018 Quit Claim Deed"). Mrs. Olson and Mr. Olson also recorded a real estate excise tax affidavit, which named Mrs. Olson as grantor and "Jeffrey R. Olson, a married man" as grantee, claiming WAC No. 458-61 A-203 "TO RELEASE COMMUNITY INTEREST." Dec. of Jeffrey Olson ¶ 8; Ex. I; Dec. of Leah Olson ¶ 5. Neither the 2018 Quit Claim Deed nor the real estate excise tax affidavit lists a purchase price for releasing the community interest. Dec. of Jeffrey Olson ¶ 8; Ex. H, I. There is no evidence in the record that the community or Mrs. Olson committed any material funds for the acquisition of the King Street House, and all material funds are traceable to the proceeds from the sale of the Berry Street House.

**B. THE REFINANCE OF THE KING STREET HOUSE**

On November 08, 2019, Mr. Olson refinanced the loan on the King Street House. Dec. of Jeffrey Olson ¶ 10; Ex. J; Dec. of Leah Olson ¶ 6. The deed of trust names "JEFFREY R. OLSON, AS HIS SEPARATE ESTATE" as the grantor. Dec. of Jeffrey Olson, Ex. J. The deed of trust and MERS Rider for the refinance contain Mrs. Olson's signature but do not list her as a borrower. Dec. of Jeffrey Olson, Ex. J. On November 08, 2019, Mrs. Olson executed another quit claim Deed "to release community interest" to "Jeffrey R. Olson, as his separate estate" as grantee. Dec. of Jeffrey Olson, Ex. K; Dec. of Leah Olson ¶ 6 (the "2019 Quit Claim Deed"). Mrs. Olson and Mr. Olson also recorded a real estate excise tax affidavit, which named Mrs. Olson as grantor and "Jeffrey R. Olson, an unmarried individual" as grantee, claiming WAC No. 458-61 A-203 "TO RELEASE COMMUNITY INTEREST." Dec. of Jeffrey Olson, Ex. K; Dec. of Leah Olson ¶ 6. Neither the 2019 Quit Claim Deed nor the real estate excise tax affidavit lists a purchase price for releasing the community interest. Dec. of Jeffrey Olson, Ex. H, I, K, L.

**C. MRS. OLSON'S BANKRUPTCY FILING**

On March 31, 2021, Mrs. Olson individually filed chapter 7 bankruptcy. Bank. 21-40567-MJH, Voluntary Petition, ECF No. 1. Mr. Olson did not file as a joint debtor in the bankruptcy case. Bank. 21-40567-MJH, ECF Nos. 1 and 31. Thus, the bankruptcy estate

includes all interests of Mrs. Olson in her separate property as well as all of Mr. and Mrs. Olson's interests in community property defined in 11 U.S.C. §541 (b)(2) but not any of Mr. Olson's separate property.

Mrs. Olson's filed bankruptcy schedules indicate that at the time of the bankruptcy filing, Mrs. Olson lived at the King Street House with her children, ages 12, 13, and 17, and her non-filing spouse, Mr. Olson. *See* Bank. 21-40567-MJH, Debtor's Official Form 122A-1, ECF No. 16, and Official Form 106J, ECF No. 15. Mrs. Olson's schedules indicate that she held an interest in the King Street House, which she identified as community property. Bank. 21-40567, ECF No. 15, p. 10. Mrs. Olson initially claimed an exemption in the King Street House pursuant to RCW 6.13.010, 6.13.020, 6.13.030, Bank. 21-40567, ECF No. 15, p. 10. The Trustee timely objected to the exemption pursuant to 11 U.S.C. § 522(g), based partly on the assertion that she had voluntarily transferred her interest in the King Street House. Bank. 21-40567, ECF No. 17. While she continued to identify the King Street House as community property in her schedules, she amended her exemption schedule to remove the earlier claimed homestead exemption. Bank. 21-40567, ECF No. 25. On or about April 10, 2023, Mr. Olson sold the King Street House. Pl.'s Second Suppl. Resp., Ex. 3 PSA.

**D. Trustee's Facts Asserted in Support of the Equitable Lien**

The Trustee alleges several facts supporting an alternative claim for relief that the bankruptcy estate may assert an equitable lien against the King Street House or proceeds from its post-bankruptcy sale. First, the Trustee states that the marital community jointly made mortgage payments on the King Street House in the asserted amount of approximately $63,690.00 between September 2018 and Mrs. Olson's bankruptcy petition in March 2021. Resp. to Mot., 2:12-2:19. The Trustee does not provide any evidence of either the value to Mrs. Olson of residing in the King Street House or the respective amounts paid by Mr. and Mrs. Olson towards the mortgage payments. However, Mr. Olson does not dispute that the community made the mortgage payments from a joint bank

account. Second, the Trustee asserts that the community paid (1) to replace a toilet and exhaust fan in the bathroom, (2) for a replacement microwave, (3) for a sliding glass door, (4) for the installation of a new hot tub, and (5) for landscaping work. Pl.'s Suppl. Resp., 1:23-2:5. Finally, the Trustee asserts that Mrs. Olson's mother paid to install an electric car charger, which the buyers provided would stay with the property. Pl.'s Suppl. Resp., 2:2-2:4. When the King Street House was sold, all the improvements were included as part of the sale. The Trustee does not provide the amount the community paid for these improvements but asserts in her pleadings generally that the post-bankruptcy sale of the King Street House netted approximately $92,000.00. Pl.'s Auth. Trans. p. 6.[1]

### III. DISCUSSION

**A. SUMMARY JUDGMENT STANDARD AS APPLIED TO THIS CASE**

The party seeking summary judgment bears the burden of demonstrating that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), made applicable by Fed. R. Bankr. P. 7056; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). All inferences drawn from the evidence presented must be drawn in favor of the party opposing summary judgment, and all evidence must be viewed in the light most favorable to that party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment should be granted if, after taking all reasonable inferences in the nonmoving party's favor, the court finds that no reasonable jury could find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The responding party may not rest upon mere allegations or denials of their pleadings but must set forth specific facts showing that there is a genuine issue for trial. *Id.* at 256.

---

[1] The Court notes that the Trustee asserts in her Supplemental Response that the net proceeds from the sale of the King Street House amounted to $92,4587.13 [sic]. Pl.'s Suppl. Resp. 2:6-2:8. This amount, however, is not supported by any evidence in the record.

Accordingly, as the moving party, Mr. Olson bears the burden of establishing that there are no genuine issues of material fact and that he is entitled to judgment as a matter of law on the fraudulent transfer and equitable lien claims. All inferences from the evidence presented are drawn in the light most favorable to the Trustee. If Mr. Olson establishes that one element of the Trustee's claims for relief is not met, he is entitled to judgment as a matter of law. *See Celotex*, 477 U.S. at 322–23 (the nonmoving party who bears the burden of proof at trial must make a "sufficient showing" that he can establish each element of his case at trial).

**B. FRAUDULENT TRANSFER LAW – IN GENERAL**

In support of her fraudulent transfer claims for relief, the Trustee relies on both state and federal fraudulent transfer statutes: 11 U.S.C. §548 (a)(1)(B) and RCW 19.40.041

**1. Section 548(a)(1)(B).**

Section 548 of the Bankruptcy Code sets forth the powers of a trustee in bankruptcy to avoid fraudulent transfers. 11 U.S.C. § 548. It permits avoidance of transfers of interests of the bankruptcy estate made with actual intent to defraud creditors as well as certain other transfers—so-called constructively fraudulent transfers. It is the latter transfers that are at issue in this case. *See* 11 U.S.C. § 548(a)(1)(B).

The U.S. Supreme Court set forth the elements for constructive fraudulent transfers under § 548(a)(1)(B) as follows:

> The provision permits avoidance if the trustee can establish (1) that the debtor had an interest in property, (2) that a transfer of that interest occurred within one year of the filing of the bankruptcy petition, (3) that the debtor was insolvent at the time of the transfer or became insolvent as a result thereof; and (4) that the debtor received "less than a reasonably equivalent value in exchange for such transfer."

*BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 535 (1994).

The Trustee bears the burden of proving each element of a fraudulent transfer by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 111 (1991)); *W. Wire Works, Inc. v. Lawler* (*In re Lawler*), 141 B.R. 425, 428 (9th Cir. BAP 1992) ("[a] fair

reading of the Supreme Court's opinion leads to the inference that the preponderance standard applies in all bankruptcy proceedings grounded in allegations of fraud."). A trustee may only avoid such transfers occurring within the two (2) years preceding a bankruptcy petition. § 548(a)(1).

**2. RCW 19.40.041 via § 544(b).**

Section 544 of the code empowers a bankruptcy trustee to invoke state law to recover certain of the debtor's prepetition transfers, including fraudulent or other avoidable transfer. 11 U.S.C. § 544(b). Here, the Trustee has invoked RCW 19.40 et. seq., known as the Uniform Voidable Transactions Act ("UVTA"), specifically RCW 19.40.041, which states as follows:

> (1) A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation:
>
> . . .
>
> (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> (i) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>
> (ii) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

RCW 19.40.041(1)(b)

Like section 548, the UVTA imposes the burden of proof on the party alleging an avoidable transfer to demonstrate each element by a preponderance of the evidence. RCW 19.40.041(3). Furthermore, Washington law imposes a four (4) year statute of limitations on fraudulent transfer claims. RCW 19.40.091.

To prevail in a fraudulent transfer action, the Trustee must establish, based on a preponderance of the evidence, that within the four-year look-back period before the bankruptcy filing,[2] (1) there was a transfer; (2) of Mrs. Olson's property or community property to Mr. Olson; (3) for which Mrs. Olson or the community did not receive a reasonably equivalent value in exchange for such transfer; and (4) Mrs. Olson or the community was insolvent at the time of transfer or was made insolvent as a result of the transfer.

### 3. Elements at issue in the Motion.

Mr. Olson has not put forth any evidence disputing that Mrs. Olson or the marital community was insolvent when she executed either the 2018 or 2019 Quit Claim Deeds, nor does he dispute that Mrs. Olson executed such Quit Claim Deeds or that such execution meets the definition of a "transfer" as such word is defined in § 101(54) (i.e., every "mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with—(i) property, or (ii) with an interest in property."). *See Erickson v. Chase*, 156 Wn. App. 151, 159 (2010) (discussing that "[a] quitclaim deed simply conveys . . . whatever interest the grantor may have in the property."). Further, Mr. Olson does not dispute that Mrs. Olson executed both Quit Claim Deeds in favor of Mr. Olson for no value. The tax affidavits associated with both Quit Claim Deeds state that Mrs. Olson received nothing for either release, and the only value given was the nominal fee paid for recording the Quit Claim Deeds.

Instead, Mr. Olson's argument in response to the Trustee's asserted fraudulent transfer claims rests solely on the assertion that no property of either Mrs. Olson or the marital community was transferred to him by either of the two Quit Claim Deeds. Specifically, Mr. Olson contends that the Berry Street House and the King Street House

---

[2] The Court notes that the statute of limitations for which a trustee may avoid a transfer of the debtor differs. *Compare* 11 U.S.C. §548(a)(1), *with* RCW 19.40.091. However, the parties have not raised a statute of limitations issue concerning either transfer and the Court will not raise the issue *sua sponte*.

were his separate property; thus, to the extent a transfer occurred, it did not transfer any property of the estate (i.e., property held by Mrs. Olson or the community). The Trustee disputes such assertions, claiming that both Quit Claim Deeds constituted transfers of the community's interest in the Berry Street House and the King Street House. In sum, based on the parties' assertions, the Motion may only be granted regarding the fraudulent transfer claims if the Court finds that neither Mrs. Olson nor the marital community held an interest in the Berry Street House or the King Street House before either transfer.

The determination of whether Mrs. Olson or the marital community held an interest cannot be addressed in the Bankruptcy Code. Instead, resolution of the foregoing issue requires reference to Washington State law to define what, if any, property was transferred by either Quit Claim Deed. *Barnhill v. Johnson*, 503 U.S. 393, 398 (1992); *Butner v. United States*, 440 U.S. 48, 54 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law").

## IV. ANALYSIS

### A. THE CHARACTER OF PROPERTY UNDER WASHINGTON LAW – IN GENERAL

Washington law heavily relies on presumptions to determine whether property is characterized as separate or community property. "The presumptions are true presumptions, and in the absence of evidence sufficient to rebut an applicable presumption, the court must determine the character of property according to the weight of the presumption." *In re Estate of Borghi*, 167 Wn.2d 480, 484 (2009). The character of property as separate or community property is determined at the date of acquisition. *Id*. Property subject to a mortgage is acquired when the obligation is undertaken. *Id*. (citing Harry M. Cross, The Community Property Law, 61 Wash. L. Rev. 13, 39 (1986)); *see also*, *In re Estate of Binge*, 5 Wn.2d 446, 454 (1940); *Beam v. Beam*, 18 Wn. App. 444, 453 (1977). Once property is established as separate or community property, it is presumed that it

maintains that character absent *clear and convincing* evidence to the contrary. *Guye v. Guye*, 63 Wn. 340, 352 (1911).

With a few exceptions, Washington law generally presumes the character of property based on whether it was acquired before or after marriage and that the status retains its character until changed either by agreement of the parties or by operation of law. *In re Dougherty's Est.*, 27 Wn.2d 11, 18 (1947). Property owned by one spouse before marriage or acquired during marriage by "gift, bequest, devise, descent, or inheritance" is presumed separate property. *See Id.*; RCW 26.16.010. Conversely, property acquired after marriage is generally presumed to be community property, regardless of how the title is held. *See* RCW 26.16.030; *Dean v. Lehman*, 143 Wn.2d 12, 19 (2001). When property is acquired during the marriage, however, the determination of its character hinges upon whether it was acquired "with community funds and community credit, or separate funds and the issues and profits thereof; the presumption, which may be rebutted by proof, being that it is community property." *Binge's Est.*, 5 Wn.2d at 484. "The burden of rebutting this presumption is on the party challenging the asset's community property status, and 'can be overcome only by clear and convincing proof that the transaction falls within the scope of a separate property exception.'" *Id.* at 19–20 (internal citations omitted) (quoting *Estate of Madsen v. Comm'r of Internal Revenue*, 97 Wn.2d 792, 796 (1982), overruled in part on other grounds by *Aetna Life Ins. v. Wadsworth*, 102 Wn.2d 652, 659–60 (1984)).

Similarly, separate property retains its character through "all of its changes and transitions," but only to the extent that such changes are "clearly traced and identified." *In re Witte's Est.*, 21 Wn.2d 112, 125 (1944) (quoting *In re Brown's Est.*, 124 Wn. 273, 276 (1923)). Furthermore, "[w]here separate funds have been so commingled with community funds that it is no longer possible to distinguish or apportion them, all of the commingled fund, or the property acquired thereby, is community property." *In re Witte's Est.*, 21 Wn.2d 112, 125 (1944). *But see Binge's Est.*, 5 Wn.2d at 466 ("[W]hen the community

property is inconsiderable in comparison with the separate property, the mass remains separate.")

RCW 26.16.050, which addresses transfers between spouses, provides in relevant part as follows:

> A spouse . . . may give, grant, sell or convey directly to the other spouse . . . his or her community right, title, interest or estate in all or any portion of their community real property: And every deed made from one spouse to the other . . . shall operate to divest the real estate therein recited from any or every claim or demand as community property and shall vest the same in the grantee as separate property. The grantor in all such deeds, or the party releasing such community interest or estate shall sign, seal, execute, and acknowledge the deed as a single person without the joinder therein of the married party . . . named as grantee . . ..

RCW 26.16.050. The statute provides how one spouse may divest themselves of an interest in community real property through conveyance to the other spouse, which vests in the grantee as separate property. These conveyances have long been considered clear and convincing evidence of creating *or maintaining the character of property as separate property. See*, e.g., *Bryant*, 28 Wn.2d at 747; *Findley v. Findley*, 193 Wn. 41, 47 (1937); *Shorett v. Signor*, 58 Wn. 89, 96 (1910); *Borghi*, 167 Wn.2d at 489.

Spouses may transmute community property into separate property or vice versa when the party holding the property has a clear intent to do so. *Borghi*, 167 Wn.2d at 484. As stated in *Borghi*, "it will be presumed that it maintains that character until some *direct and positive evidence* to the contrary is made to appear." *Id.* (emphasis added). The party asserting transmutation or commingling must demonstrate such intent by the party holding the property as separate to change the character either by direct action or by indirect actions which show a lack of intent to maintain the character of the property (e.g., through commingling that prevents tracing). *Id.* at 485. *See also Witte's Est.*, 21 Wn. 2d at 126–30 (finding commingling of farm income by spouse owning separate property to such an extent that it was impossible to disentangle or apportion the parts from the mass); *In re Marriage of Shui & Rose*, 132 Wash. App. 568, 583 (2005) (holding that proceeds of

stock options having a mixed character when commingled so that it is impossible to trace are, by law, entirely community property).

**B.  THE 2018 QUIT CLAIM DEED**

### 1.  The Berry Street House and its Proceeds are Presumed to Be Mr. Olson's Separate Property.

Mr. Olson purchased the Berry Street House in 2015 as an unmarried man, and as such, it is unequivocally presumed to be his separate property under Washington law. *Dougherty's Est.*, 27 Wn.2d at 18; RCW 26.16.010. While Mr. Olson and Mrs. Olson married in 2018, unless clear and convincing evidence shows that Mr. Olson intended to transmute the property into community property, it retained its separate character while he owned the Berry Street House.

Mr. Olson sold the Berry Street House in 2018 to purchase the King Street House. Washington law presumes that separate property retains its character throughout all its changes and transitions, such as liquid proceeds, so long as it remains traceable and identifiable. *See Witte's Est.*, 21 Wn.2d at 125. Furthermore, absent clear and convincing evidence to the contrary, the proceeds from the sale of the Berry Street House retained its character as Mr. Olson's separate property. *See Guye*, 63 Wn. at 352. Accordingly, a strong presumption exists that the proceeds from the Berry Street House remained Mr. Olson's separate property.

### 2.  The Trustee has not rebutted the presumption that the Berry Street House and its Proceeds were Mr. Olson's separate property.

The Trustee must present clear and convincing evidence to rebut the presumption and show that a reasonable trier of fact could find, based on the evidence in the record, that Mr. Olson intended to transmute the Berry Street House and its proceeds to community property before its sale in 2018.

In support, the Trustee asserts that Mr. Olson and Mrs. Olson were named as sellers of the Berry Street House on the Lewis County Title Company sale documents.

Furthermore, upon the sale of the Berry Street House, Lewis County Title Company issued checks payable to both Mr. Olson and Mrs. Olson. Finally, the Trustee points to the warranty deed executed by Mr. Olson and Mrs. Olson as grantors for the sale of the Berry Street House.

The Trustee's evidence, however, does not raise factual issues as to Mr. Olson's intent but instead presents undisputed facts displaying the actions of Lewis County Title Company. The Trustee does not assert that Mr. Olson personally completed the purchase and sales agreement paperwork, nor does the Trustee assert that Mr. Olson directed Lewis County Title Company to issue the checks to himself and Mrs. Olson. To transmute property into the marital community, the party alleging transmutation must support the allegation with evidence of the owner's intent to transmute or commingle. Neither the sales paperwork nor the checks evidence either because the amounts on the checks are traceable and identifiable as sale proceeds and were done by Lewis County Title Company—not Mr. Olson.

More than the warranty deed and joint check issued by a title company is needed to show Mr. Olson transmuted the Berry Street House into the marital community before the sale. If accompanied by additional evidence of Mr. Olson's intent, the warranty deed could show that Mr. Olson intended to transmute the Berry Street House into the marital community before the sale. *See* RCW 26.16.030(3) ("Neither person shall sell, convey, or encumber the community real property without the other spouse . . . joining in the execution of the deed . . . and such deed or other instrument must be acknowledged by both spouses."). However, this alone is insufficient to rebut the presumption that the Berry Street House was and remained Mr. Olson's separate property. *See Binge's Est.*, 5 Wn.2d at 484 (the party challenging community property status can only overcome a presumption by clear and convincing evidence). After examining the presented evidence in the most favorable light for the Trustee, it is insufficient to satisfy the burden required to rebut the presumption that the Berry Street House and its traceable proceeds were Mr. Olson's

separate property. *See Liberty Lobby*, 477 U.S. at 255 (taking all reasonable inferences in the nonmoving party's favor, the court finds that no reasonable jury could find for the nonmoving party). In sum, the Court finds that the Berry Street House and its traceable liquid proceeds are Mr. Olson's separate property.

### 3. The King Street House was purchased with proceeds from Berry Street House, maintained as Olson's separate property, and the Trustee has failed to rebut the presumption.

It is undisputed that Mr. Olson applied substantially all the net proceeds from the sale of the Berry Street House directly to the purchase of the King Street House. Lewis County Title Company wired most of the proceeds from the sale, $49,894.13, to be directly applied to purchasing the King Street House, and the remaining $2,893.07 in a check to the Olsons. Dec. of Jeffrey Olson ¶ 4; Ex. B, C, D. There is no evidence in the record that significant community funds were used to purchase the King Street House. As previously noted, property acquired during marriage with separate property and proceeds of such property are presumed separate property. *See Id*. 484. Accordingly, a presumption for separate property exists to the extent that the proceeds from the Berry Street House paid for the King Street House.

Furthermore, the undisputed facts show that Mr. Olson separately financed the remaining purchase price of the King Street House by obtaining a loan. The deed of trust securing the loan names Mr. Olson as the sole borrower and grantor under the note and deed of trust. Thus, the undisputed facts show that Mr. Olson was the sole purchaser of the King Street House and, upon acquisition, that the King Street House was Mr. Olson's separate property. *See Borghi*, 167 Wn.2d at 484 (property subject to a mortgage is acquired when the obligation the obligation is undertaken). It is undisputed that Mrs. Olson executed the 2018 Quit Claim Deed to Mr. Olson contemporaneously with purchasing the King Street House. Washington law establishes such a conveyance as an

unequivocal intent to keep the King Street House as separate property. *See Johnson*, 41 Wn.2d at 249; RCW 26.16.050.

The undisputed evidence creates a presumption that the Berry Street House was Mr. Olson's separate property and that Mr. Olson also intended for the King Street House to be Mr. Olson's separate property. Mr. Olson has met his burden that he had the unequivocal intention of making the King Street House his separate property. The Trustee has not offered any evidence that raises material issues of fact concerning the character of either the King Street House or the Berry Street House when Mr. Olson purchased the King Street House in 2018. Accordingly, the Court finds that Mr. Olson has established that the King Street House was his separate property and not subject to any interest held by the marital community.

### 4. Mr. Olson is entitled to summary judgment on the fraudulent transfer claim related to the 2018 Quit Claim Deed.

The court finds that, as previously noted, while a quit claim deed falls within the meaning of transfer, the mere execution of a quit claim deed is not enough because it only transfers whatever interest that the grantor has at the time of its execution that is capable of transfer. *Crafts v. Pitts*, 161 Wn.2d 16, 20 (2007); *McCoy v. Lowrie*, 44 Wn.2d 483, 486 (1954) (quoting K.A. Drechsler, Annotation, Rights or Interests Covered by Quitclaim Deed, 162A.L.R. 556, 557(1946)) Having found that the Berry Street House, the proceeds of the Berry Street House and the King Street House acquired with such proceeds were all Mr. Olson's separate property, the Court finds that no property interest held by Mrs. Olson's estate was transferred pursuant to the 2018 Quit Claim Deed. Accordingly, Mr. Olson is entitled to summary judgment on the fraudulent transfer claims related to such deed because the Trustee cannot establish an essential element of her fraudulent transfer claim.

## C. THE 2019 QUIT CLAIM DEED

### 1. The King Street House was Mr. Olson's separate property and retained its character as separate property.

Mr. Olson asserts that the 2019 Quit Claim Deed could not constitute a fraudulent transfer. Specifically, when he refinanced the King Street House, it was his separate property, and, like the 2018 Quit Claim Deed, neither Mrs. Olson nor the marital community held any interest that the 2019 Quit Claim Deed could have transferred.

Based on the undisputed facts, the Court has determined that, as a matter of law, a presumption exists that Mr. Olson and Mrs. Olson intended to maintain the King Street House as Mr. Olson's separate property at the time of purchase in 2018. Mr. Olson remained the only obligor under the deed of trust and promissory note throughout the loan's life. The Trustee has not produced evidence that Mr. Olson intended to transmute the King Street House or commingled the property with the marital community. Therefore, beginning with the purchase in 2018 up until the refinance in 2019, a presumption existed that the King Street House is presumed to have been Mr. Olson's separate property.

Mr. Olson refinanced the King Street House in 2019. The refinancing does not change the character of the King Street House, but rather, it retains its character as separate property absent a showing to the contrary. *See Guye*, 63 Wn. at 352. Like its predecessor, the refinanced deed of trust names Mr. Olson as sole borrower and grantor under the note and deed of trust. Indeed, throughout the refinance process, the property remained a single unit that was identifiable and traceable as separate property. Accordingly, a strong presumption exists that the King Street House retained its character as Mr. Olson's separate property.

Mrs. Olson executed the 2019 Quit Claim Deed to Mr. Olson contemporaneously with the refinance of the King Street House. Like the 2018 Quit Claim Deed, Washington law establishes such a conveyance as an unequivocal intent to maintain the property as

separate. *See Johnson*, 41 Wn.2d at 249; RCW 26.16.050. The 2019 Quit Claim Deed establishes an unequivocal intent to keep the King Street House as Mr. Olson's separate property. Accordingly, based on the undisputed facts, a presumption exists that the King Street House at the time of the refinance in 2019 was Mr. Olson's separate property.

**2. The Trustee has failed to present evidence indicating that Mr. Olson intended to transmute the King Street House into the marital community.**

With respect to the 2019 Quit Claim Deed, the Trustee must present genuine issues of material fact that could conceivably rebut the presumption that the King Street House was separate property. Moreover, the Trustee must present evidence that a reasonable trier of fact at trial could find that Mr. Olson, through act or deed, intended to transmute the King Street House from his separate property to community property between the purchase in 2018 through the refinance in 2019 when Mrs. Olson executed the 2019 Quit Claim Deed.

The Trustee relies on the following evidence to support her fraudulent transfer claim as to the 2019 Quit Claim Deed. First, she argues that because Mr. Olson submitted copies of a joint bank account to support the refinance in 2019, it shows an intent to rely on the community credit. However, the face of the loan documents and deed do not support such an assertion. Pl.'s Second Supp. Resp. Mot. Summ. J. Ex. 1. Second, the Trustee asserts, which Mr. Olson does not dispute, that marital funds were used to make mortgage payments on the King Street House. Restated, the Trustee asserts that Mr. Olson transmuted the King Street House into community property before the refinance in 2019. Finally, the Trustee asserts that Mrs. Olson's identification of the King Street House as community property two years after the 2019 Quit Claim deed supports the transmutation of the King Street House into community property.

Once more, the Trustee's evidence is insufficient to rebut the presumption of the separate nature of the King Street House as of the date of the 2019 Quit Claim Deed.

Characterization of property acquired during the marriage depends on what assets and obligations were used to acquire such property. *Binge's Est.*, 5 Wn.2d at 484. The King Street House was already separate property, and the refinance does not reset the time one determines acquisition. *See Borghi*, 167 Wn.2d at 484 (the character of property subject to a mortgage is determined at the date of acquisition.). Even if it did, the result is the same because Mr. Olson obligated only himself on the refinanced loan. No community assets were used to refinance the loan.

The Trustee is incorrect that maintenance payments on a mortgage evidence Mr. Olson's intent to transmute the King Street House into community property. Washington law provides that using community funds to pay off a mortgage on a separate property does not change the property's status but, at most, entitles the community to an equitable lien against the property. *See Merkel v. Merkel*, 39 Wn.2d 102, 114–15 (1951); *In re Marriage of Harshman*, 18 Wn. App. 116, 123 (1977); *Seaton v. Smith*, 186 Wn. 447, 452 (1936); *Guye*, 63 Wn. at 352–53; *Dobbins v. Dexter Horton & Co.*, 62 Wn. 423, 428 (1911). Thus, community property contributions committed to the payments of such obligations or improvements to separate property *may* give rise to a right of reimbursement in favor of the marital community enforceable through an equitable lien, but that does not result in the transmutation of the property from separate to community property. *See Borghi*, 167 Wn.2d at 490 n.7 (emphasis added). Accordingly, the Trustee has failed to rebut the presumption that the King Street House retained its character as Mr. Olson's separate property.

### 3. Neither Mrs. Olson nor the marital community held any interest in the King Street House when she executed and delivered the 2019 Quit Claim Deed.

Just as with the 2018 Quit Claim Deed, neither Mrs. Olson nor the marital community held an interest in the King Street House when she executed and delivered the 2019 Quit Claim Deed because it was Mr. Olson's separate property. Thus, the 2019 Quit Claim

Case 23-04009-MJH    Doc 36    Filed 12/13/23    Ent. 12/13/23 16:08:31    Pg. 20 of 25

Deed, to the extent that an ineffective quit claim deed falls under the definition of transfer, did not transfer any property that Mrs. Olson or the marital community held an interest in.

Accordingly, as the movant, Mr. Olson has established, as a matter of law based on the undisputed facts, that he is entitled to summary judgment on the Trustee's asserted fraudulent transfer related to Mrs. Olson execution of the 2019 Quit Claim Deed because the Trustee is unable to establish an essential element of such claim (i.e., that a transfer of an interest of property of the estate occurred).

**D.  EQUITABLE LIEN**

   **1.  Equitable liens are security devices that arise when equity requires one to enforce a right of reimbursement.**

The Trustee contends that even if neither Mrs. Olson nor the marital community held a property interest in the King Street House, the Court should find that a right of reimbursement in favor of the marital community existed, arising from contributions and improvements made to the King Street House at the expense of the marital community, and impose an equitable lien to enforce such right.

An equitable lien is nothing more than a security device imposed to secure a right of reimbursement. Equitable liens arise when a debt is owed in spouse-to-spouse or third-party-to-spouse transactions. As the name suggests, equitable liens arise under equitable principles to secure a debt not expressly provided for under the law. Washington caselaw refers to such debt as a "right of reimbursement." *See Lindemann v. Lindemann*, 92 Wn. App. 64, 74 (1998); *Nelson v. Nelson Neal Lumber Co.*, 171 Wn. 55, 61 (1932). The party alleging that a right of reimbursement exists has the burden of proving the existence and amount of such right upon a clear and convincing standard. *Elam v. Elam*, 97 Wn.2d 811, 816 (1982).

Under Washington law, a right of reimbursement often arises between spouses in the context of breaches of fiduciary duty. In Washington, spouses owe a duty to the marital

community and must manage it in its best economic interests. *See In re Marriage of Hadley*, 88 Wn.2d 649, 655 (1977) (addressing the duty of good faith); *In re Madden's Est.*, 176 Wn. 51, 55 (1934) (addressing the entire fairness standard in marital transactions). Using community property or labor to improve the separate property may constitute a breach of fiduciary duty. *See W. T. Rawleigh Co. v. McLeod*, 151 Wn. 221, 224 (1929); *In re Marriage of Jafeman*, 29 Cal. App. 3d 244, 256 (Ct. App. 1972); *Binge's Est.*, 5 Wn.2d at 485; *In re Woodburn's Estate*, 190 Wn. 141, 144–45 (1937); *In re Finn's Estate*, 106 Wn. 137, 140 (1919).

Fairness may also dictate the imposition of an equitable lien because one spouse has engaged in conduct such that equity dictates such a remedy. This basis for reimbursement is wholly and "undoubtedly predicated upon equitable considerations" and often involves third parties. Harry M. Cross, *The Community Property Law in Washington*, 49 Wash. L. Rev. 729, 776 (1974); *See also* Harry M. Cross, *The Community Property Law (Revised 1985)*, 61 Wash. L. Rev. 13, 46 (1986). A creditor's rights may give rise to requiring reimbursement and perhaps even imposing an equitable lien, even when the spouse is not requesting it. *See Conley v. Moe*, 7 Wn.2d 355 (1941) (concluding that the trustee in bankruptcy could assert the community equitable lien against improved separate realty).

If the marital community has contributed the labor or funds and has benefitted from the contribution, no right of reimbursement exists because no debt exists. *Miracle v. Miracle*, 101 Wn.2d 137, 139 (1984). As the Washington Supreme Court stated in *Miracle*:

> An equitable lien is a remedy intended to protect one party's right to reimbursement. *In re Marriage of Harshman*, 18 Wash.App. 116, 567 P.2d 667 (1977); Cross, The Community Property Law in Washington, 49 Wash.L.Rev. 729, 776 (1974). A right to reimbursement may not arise if the contributing spouse received a reciprocal benefit flowing from the use of the property. *Merkel v. Merkel*, 39 Wash.2d 102, 234 P.2d 857 (1951); *In re Woodburn's Estate*, 190 Wash. 141, 66 P.2d 1138 (1937); *In re Marriage of Johnson*, 28 Wash.App. 574, 625 P.2d 720 (1981); *In re Marriage of Harshman*, supra. In that case, equity will find that the contributing spouse has already been reimbursed. Cross, 49 Wash.L.Rev. at 777 n. 220, 779.

MEMORANDUM DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT – 22

*Id.* Restated, the individual claiming the right to reimbursement must have provided more than the worth of the mutual benefit acquired, if any.

## 2. The Trustee has failed to demonstrate how the marital community is entitled to a right of reimbursement.

To prevail in imposing an equitable lien in favor of the Trustee, the Trustee bears the burden of providing clear and convincing evidence (1) of the existence of a debt owed by the marital community arising out of contributions and improvements made by the marital community to the King Street House, and (2) that the principles of equity require the Court to impose an equitable lien to secure repayment of the debt. Notwithstanding that asserting a right of reimbursement requires an independent cause of action or statutory grant,[3] the Trustee, stepping into Mrs. Olson's shoes, has failed to establish how she could prevail under such a theory.

The Trustee asserts various contributions and improvements made by the marital community to the King Street House. The Trustee argues that the marital community paid mortgage payments and paid for improvements on the house, including adding new appliances, a hot tub, a toilet and exhaust fan, a car charging station, and landscaping. Mr. Olson contends that Mrs. Olson received a reciprocal benefit by occupying and using his separate property, which exceeded any improvements or mortgage contributions made by the marital community.

Even if the Court assumes that all the Trustee's assertions regarding marital contributions and improvements are true, which Mr. Olson does not dispute, the marital community's imputed contribution is insufficient to give rise to a right of reimbursement. It is the Trustee's burden to show that the marital contributions exceed the reciprocal benefit. *See Elam*, 97 Wn.2d at 816. *See also Miracle*, 101 Wn.2d at 139. Community funds used to pay maintenance payments, such as mortgage payments, do not give rise to a right

---

[3] *See Miracle*, 101 Wn.2d at 138 (trial in the dissolution proceeding); *Conley* 7 Wn.2d at 359; *see also* RCW 26.09.080.

of reimbursement unless such payments exceed the value of occupancy. *Id. See Also Merkel*, 39 Wn.2d 102 (1951); *In re Woodburn's Estate*, 190 Wn. 141 (1937); *In re Marriage of Johnson*, 28 Wn. App. 574 (1981).

The Trustee asserts that the marital community paid approximately $26,600 in mortgage payments towards the King Street House between September 2018 and the refinance in 2019 and approximately $63,690 over 32 months. Pl.'s. Resp. Mot. Summ. J., 2:11-2:19. The Trustee's allegation, however, is not supported by any evidence before the Court, and even if the marital community made mortgage payments on the King Street House, the Trustee has failed to demonstrate how the mortgage contributions could have exceeded the reciprocal benefit of using the property.

. The Trustee does not provide specific amounts for any improvement and only approximations for the amount the marital community paid for the hot tub, which was between $6,000.00 and $8,000.00. Pl.'s Auth. Trans. p. 17. The rule of measurement when the conduct concerns improvement to property is found in *In re Marriage of Elam*, holding that the community is entitled reimbursement representing the increase in value to the separate property due to the community contribution in its improvement, *plus* the inflationary increase in that amount if any exists. 97 Wn.2d 811, 816 (1982). The Trustee's mere assertions that the marital community contributions give rise to a right of reimbursement are insufficient. *See Liberty Lobby*, 477 U.S. at 255 (nonmoving party may not rest upon mere allegations).

The Trustee has failed to demonstrate that a right of reimbursement could even have existed, let alone that such right of reimbursement merits the imposition of an equitable lien. Accordingly, the Court finds the Trustee's assertion concerning an equitable lien is without merit.

**V. CONCLUSION**

Based on the undisputed facts presented, Mr. Olson has established that neither of the Quit Claim Deeds, in 2018 and 2019, involved transfers of the estate's interests in property, as the marital community held no interest in either the Berry Street House or the King Street House at the time of the execution of such Quit Claim Deeds. Accordingly, the elements of a constructively fraudulent transfer under either § 548(a)(1) or RCW 19.40.041 via § 544(b) are not satisfied as a matter of law. Additionally, the Trustee has failed to provide sufficient evidence to establish a right to an equitable lien as a matter of law, and the Court grants summary judgment in favor of Mr. Olson on such claim.

/ / / End of Memorandum Decision / / /

MEMORANDUM DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT – 25